**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
CHARLOTTE DIVISION

| | | |
|---|---|---|
| MAACO FRANCHISING, LLC, | ) | CIVIL ACTION NO. |
| | ) | 3:16-cv-155-GCM |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| JEFFREY R. BOENSCH, LORI J. | ) | |
| BOENSCH, and RONALD E. EASON, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

This cause comes before the Court on Plaintiff's, Maaco Franchising, LLC ("Maaco"),
Motion for Preliminary Injunction, due notice having been given to Defendants, Jeffrey R.
Boensch ("J. Boensch"), Lori J. Boensch ("L. Boensch"), and Ronald E. Eason ("Eason")
(collectively, the "Defendants"), the Court having considered Maaco's Verified Complaint (Doc.
No. 1), Maaco's Motion for Preliminary Injunction (Doc. No. 18) (the "Motion"), Maaco's
Memorandum of Law (Doc. No. 18-1) in support thereof, and the Defendants failure to appear or
respond to the Motion, pursuant to Rule 7.1E, Rules of Practice and Procedure of the United States
District Court for the Western District of North Carolina. The Court, having considered the
authority and evidence submitted to the Court, and being otherwise fully advised in the premises,
hereby makes the following findings of fact and conclusions of law:

    1.    Maaco filed its Verified Complaint on April 4, 2016. (Doc. No. 1).

    2.    Maaco served its Verified Complaint upon J. Boensch and L. Boensch (the
"Boenschs") on April 21, 2016, and upon Eason on June 23, 2016. (Doc. Nos. 5, 7, 16).

    3.    Maaco filed and served its Motion for Preliminary Injunction and supporting
Memorandum of Law on July 20, 2016. (Doc. Nos. 18, 18-1).

**FINDINGS OF FACT**

4.      Maaco is a limited liability company organized and existing under the laws of the State of Delaware, with its offices and principal place of business located at 440 South Church Street, Suite 700, Charlotte, Mecklenburg County, North Carolina. <u>See</u> Verified Compl., ¶ 2.

5.      Defendants are citizens and residents of the State of Michigan residing in Saginaw County and Genesee County, Michigan. <u>See</u> Verified Compl., ¶¶ 3–6.

6.      Founded in 1972, Maaco developed a comprehensive operating system for its third-party franchisees to establish and operate vehicle painting and auto body repair businesses under a standard, unique, and uniform system that includes specially designed spaces containing proprietary equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, proprietary marks and information (the "Maaco System") and to otherwise protect Maaco's image by ensuring uniform, high quality standards. <u>See</u> Verified Compl., ¶ 18.

7.      Maaco details its proprietary and unique Maaco System in its operations manual by setting forth the Maaco System's uniform operational standards and product specifications, as well as the Maaco System's policies and procedures (the "Operations Manual"). <u>See</u> Verified Compl., ¶ 19.

8.      Over forty years after its founding, Maaco remains engaged in the business of franchising Maaco Collision Repair & Auto Painting Centers that utilize the Maaco System as set forth in its Operations Manual to specialize in automobile painting and body repair and in other automotive products and services. As a result of the consistently high level of customer service arising from the use of the Maaco System and the substantial amount of money and effort invested in advertising associated with Maaco's trademarks, service marks, trade names, and trade dress

over the past forty years, Maaco enjoys a substantial amount of goodwill and a large pool of customers. <u>See</u> Verified Compl., ¶ 20.

9.      Maaco's substantial investments of time, money, and effort to develop, implement, and advertise the Maaco System has established and resulted in a favorable reputation and a positive image with the public as to the quality of goods and services available at Maaco vehicle painting and auto body repair centers. <u>See</u> Verified Compl., ¶ 24.

10.      In turn, Maaco franchises and licenses to third-parties the right to take advantage of Maaco's goodwill by operating a motor vehicle painting and auto body repair center using the Maaco System as detailed by the Operations Manual and displaying Maaco's trade names, service marks, and trademarks pursuant to the terms and conditions of its written franchise agreement. <u>See</u> Verified Compl., ¶ 21.

11.      In addition, Maaco provides its franchisees with specialized training and on-going business support to monitor and assist franchisees' compliance with the Maaco System. <u>See</u> Verified Compl., ¶¶ 22–23.

12.      In exchange for these benefits, Maaco requires its franchisees, among other things, to: (i) pay Maaco franchise royalties based on the weekly sales reported by its franchisees; (ii) contribute to Maaco's advertising fund; and (iii) forego involvement with any competing business during the term of the parties' written agreements and for one year thereafter. <u>See</u> Verified Compl., ¶¶ 26–29.

*Maaco's Protected Trademarks, Trade Dress, Logos, and Color Scheme*

13.     Since its founding, Maaco has extensively used, caused to be advertised, and publicized throughout the United States certain distinctive color schemes, logos, and symbols as trademarks, service marks, and trade dress to identify the source, origin, and sponsorship of its system's facilities and services (the "Maaco Marks"). <u>See</u> Verified Compl., ¶ 30.

14.     Among the Maaco Marks, Maaco owns the marks and, as applicable, related logos "Maaco Collision Repair & Auto Painting," "Maaco Auto Painting and Bodyworks" and "America's Bodyshop" which are registered with the United States Patent and Trademark OfficeNo. 3,006,015, No. 1,050,442 and No. 2,787,733, respectively. <u>See</u> Verified Compl., ¶ 31.

15.     Maaco and its franchisees have continuously used and advertised Maaco's Marks throughout the United States and its Territories. Maaco's trademarks, trade dress, logos, and distinctive color scheme strongly distinguish its franchises from similar businesses and are widely known and recognized by consumers. <u>See</u> Verified Compl., ¶ 32.

16.     Since 1972, all goods and services lawfully manufactured, distributed or sold in the United States by Maaco and its authorized franchisees under the name "Maaco" and Maaco trademarks, trade dress, logos, and distinctive color scheme are done so pursuant to the licenses granted by Maaco under its franchise agreements. <u>See</u> Verified Compl., ¶ 33.

17.     Each franchisee or licensee who so manufactures, distributes, or sells such goods and services does so in association with the name "Maaco" and the Maaco Marks. <u>See</u> Verified Compl., ¶ 34.

18.     Maaco was the first to adopt and use the Maaco Marks as trademarks and service marks. Since that time, Maaco and its franchisees have spent many millions of dollars in the United States and abroad advertising, promoting, and publicizing the Maaco Marks, as well as Maaco

motor vehicle painting and body repair businesses and Maaco's goods and services. See Verified Compl., ¶ 35.

19.     The substantial investment in advertising, promotion, and publicity, as well as in the development and implementation of the Maaco System, results in the Maaco Marks and the businesses, goods and services associated with those marks enjoying valuable goodwill, approval, and public recognition. As a result of this substantial investment, the Maaco Marks are strong and distinctive and have acquired a secondary meaning, as the consuming public associates Maaco's products and services with those items. See Verified Compl., ¶ 36.

20.     Maaco motor vehicle painting and body repair businesses, and those goods and services associated with the Maaco Marks, are approved, recognized, and understood by the public to be produced, marketed, sponsored, or supplied by, and/or affiliated with Maaco. The approval, recognition, and understanding are valuable assets to Maaco. See Verified Compl., ¶ 37.

21.     Maaco's goods and services are offered and sold in interstate commerce and all goods and services lawfully manufactured, distributed, and/or sold in the United States under the name "Maaco" and the Maaco Marks were manufactured, distributed, and/or sold pursuant to exclusive licenses granted by Maaco to approved franchisees. See Verified Compl., ¶ 38.

22.     All right, title, and interest in the Maaco Marks, as well as the design, decor, and image of Maaco® motor vehicle painting and body repair businesses, are owned by and remain solely vested in Maaco and/or its affiliates. See Verified Compl., ¶ 39.

*Maaco's Agreement with Defendants*

23.     On or about January 7, 2009, Maaco entered into that certain "Maaco Franchising, Inc. Franchise Agreement" (the "Franchise Agreement") with Defendants relating to the operation of the franchised Maaco® Center at 2758 McCarty Road, Saginaw, Michigan 48603 (the

"Center"). <u>See</u> Verified Compl., ¶ 42. A true and correct copy of the Franchise Agreement was filed with the Court April 4, 2016, Docket Number 1-2.

*Maaco's Obligations*

24.     Pursuant to the Franchise Agreement, Maaco was required to provide Defendants with certain services. Those services are to: (i) provide Defendants' representative with an initial training program in the Maaco System; (ii) provide Defendants with one copy of Maaco's Operations Manual; (iii) use Defendants' initial advertising contribution to provide for the Center's opening promotion and initial advertising; (iv) use and administer the advertising contributions made by Defendants as set forth in the Franchise Agreement; and (v) provide Defendants with a set of specifications for the types and quantities of inventory, supplies, equipment, and signage necessary to operate the Center. <u>See</u> Verified Compl., ¶¶ 46–48; Franchise Agreement, pp. 3–4.

25.     Maaco complied with each of these obligations in accordance with the terms and conditions of the Franchise Agreement. <u>See</u> Verified Compl., ¶¶ 46–48<u>.</u>

*Defendants' Obligations*

26.     Pursuant to the Franchise Agreement, Defendants are required to maintain and preserve full and accurate books, records, and accounts of the Center for at least seven (7) years from the dates of their preparation and to allow Maaco an opportunity to examine those books, records, and accounts at all reasonable times. <u>See</u> Verified Compl., ¶ 50; Franchise Agreement, pp. 8–9, ¶ 12.

27.     In addition, Defendants are required to (i) pay Maaco on a weekly basis a continuing franchise fee, or royalty, at the rate of 9% of the shop's gross revenue; (ii) pay a weekly advertising contribution in the amount of Eight Hundred Fifty Dollars ($850.00) or other such amount provided by Maaco; (iii) furnish Maaco with accurate weekly business reports of the

Center's gross sales; and (iv) pay Maaco for paint and supplies ordered from Maaco. <u>See</u> Verified Compl., ¶ 49; Franchise Agreement, pp. 3–9, ¶¶ 5A (royalties), 5B (advertising contribution), 12 (weekly reporting), and 7J and 7L (paint and supplies).

*Defendants' Breach of the Franchise Agreement*

28.     Defendants violated the Franchise Agreement by failing to (i) cooperate with Maaco's efforts to examine the Center's books, records, and accounts and (ii) make royalty, advertising and merchandise payments to Maaco. <u>See</u> Verified Compl., ¶¶ 52–56.

29.     By letter dated October 7, 2015, Maaco provided Defendants with written notice of their breach of the Franchise Agreement for their failure to cooperate with the Center's audit (the "Notice of Default for Missing Records"). <u>See</u> Verified Compl., ¶ 54.

30.     By letter dated November 16, 2015, Maaco provided Defendants with written notice of their breach of the Franchise Agreement for their failure to make all required payments due and owing under the Franchise Agreement (the "Notice of Default for Overdue Payments"). <u>See</u> Verified Compl., ¶ 56.

31.     Despite the opportunity and obligation to do so, Defendants failed and/or refused to cure their defaults of the Franchise Agreement. <u>See</u> Verified Compl., ¶ 58.

32.     On January 27, 2016, Maaco provided Defendants with written notice of its termination of the Franchise Agreement (the "Notice of Termination") and requested that the Defendants comply with the post-termination obligations set forth in the Franchise Agreement and under the law. <u>See</u> Verified Compl., ¶¶ 62–63.

33.     In the Notice of Termination, Maaco also requested that Defendants comply with their post-termination obligations as set forth in the Franchise Agreement and under the law. Specifically, Maaco demanded, among other things, that Defendants: (i) stop operating the Center

in violation of the Franchise Agreement's non-competition provision; (ii) stop use of the Maaco System; (iii) stop use and display of the Maaco Marks; (iv) stop accepting new customers using Maaco's forms and paperwork; (v) modify and/or alter the Center to disassociate itself from Maaco; and (vi) return the Operations Manual and all other records, files, instructions, correspondence, and material related to Defendants' operation of the Center. <u>See</u> Verified Compl., ¶ 63.

34.    Despite receiving the Notice of Termination, Defendants continue to operate the Center in violation of their non-compete obligations and use confusingly similar trade names and trade dress, including the name "Jeffco" utilizing the same distinctive Maaco color scheme. <u>See</u> Verified Compl., ¶¶ 70–72.

35.    Moreover, Defendants continue to partially display signage containing a portion of Maaco's registered trademark "America's Bodyshop" and display exterior and interior signage and décor containing distinctive elements associated with Maaco locations, which were displayed during the Center's time as an authorized Maaco location. <u>See</u> Verified Compl., ¶ 72.

36.    Defendants continue to deceive the public by identifying the Center as a Maaco to prospective or actual customers contacting the Center by telephone. <u>See</u> Verified Compl., ¶ 74. Specifically, Edmund Wright, Maaco's Senior Auditor, contacted the Center on or about February 11, 2016 and asked the Center "Is this no longer a Maaco?" to which the Center responded "Yes. Everything is the same. We are still Maaco, but changed our name." Declaration of Edmund Wright, pp. 1–2, ¶ 6.

# CONCLUSIONS OF LAW

In order obtain a preliminary injunction, Maaco must establish: "(1) that [it] is likely to succeed on the merits, (2) that [it] is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in [Maaco's] favor, and (4) that an injunction is in the public interest." Real Truth About Obama v. Fed. Election Comm., 575 F.3d 342, 346 (4th Cir. 2009) (quoting Winter v. Nat. Res. Def. Council, Inc., 129 S. Ct. 365, 375–76 (2008)), vacated by 559 U.S. 1089, 1089 (April 26, 2010), reinstated in relevant part by 607 F.3d 355 (4th Cir. June 8, 2010).

*Likelihood of Success on the Merits*

Maaco seeks the issuance of a preliminary injunction based upon two claims: (i) breach of Defendants' non-competition provision; and (ii) violation of the Lanham Act as a result of Defendants' trademark infringement, trade dress infringement, and trademark dilution.

Count I – Breach of Contract

In Count I, Maaco pleads an action for breach of the non-competition provisions of the parties' franchise agreements. As relevant, Defendants agreed in paragraph 18C of the Franchise Agreement that:

> For a period of one (1) year from whichever of the following events occur later: (i) the expiration or termination of this [Franchise] Agreement, regardless of the cause of termination; (ii) the date upon which [Defendants] cease[] to operate the business franchised hereunder following termination or expiration of this Agreement; or (iii) the date upon which [Defendants] complies with this Paragraph 18C., [Defendants] shall not either directly or indirectly, for himself or through, on behalf of, or in conjunction with any other person, persons, partnership or corporation . . .
>
> (2) own, maintain, engage in, be employed by, finance, assist or have any interest in any business providing, in whole or in part, motor vehicle painting or body repair services or products at the premises of the Center or within a ten (10) mile radius of the Center or within a ten (10) mile radius of any existing or proposed Maaco location.

Franchise Agreement at ¶ 18C.

In order to demonstrate the requisite likelihood of success on the merits, Maaco must show that it is likely to prove that the non-competition covenant is valid and enforceable. Under North Carolina law, courts review the enforceability of a non-competition covenant in the context of a sale of the franchisor's goodwill for a limited duration to a franchisee. See Baskin-Robbins, Inc. v. Golde, 2000 WL 35536665, at *5 n.5 (E.D.N.C. May 25, 2000). In conjunction with the sale of a business, a covenant not to compete is enforceable in North Carolina if: (1) it is reasonably necessary to protect the legitimate interests of the person seeking its enforcement; (2) it is reasonable with respect to both time and territory; and (3) it does not interfere with the interest of the public. Meineke Car Care Centers, Inc. v. Bica, 2011 WL 4829420, at *4 (W.D.N.C. October 12, 2011) (internal citation omitted); Bicycle Transit Auth., Inc. v. Bell, 333 S.E.2d 299, 303–304 (N.C. 1985); Jewel Box Stores Corp. v. Morrow, 158 S.E.2d 840, 843 (N.C. 1968).

Maaco satisfies the first prong of the test because the non-competition covenant is necessary to protect multiple valid and legitimate business interests of Maaco. Among other interests, the covenant is specifically designed to protect Maaco's proprietary operating system, its confidential information, and the goodwill associated with its trademarks, service marks, trade name, and trade dress developed through the investment of substantial amount of time, money and effort. See Outdoor Lighting Perspectives Franchising, Inc. v. Home Amenities, Inc., 2012 WL 137808, at *2 (W.D.N.C. January 18, 2012) (holding that enforcement of a non-competition covenant is necessary to protect a franchisor's legitimate business interests when the franchisor has invested substantial, time, money, and other resources in developing its business operating format, trademark, and trade names). North Carolina courts recognize that a franchisor's investment in its legitimate business interests warrants the enforcement of a non-competition

covenant. Previously, this Court has found that a franchisor's investment of resources to "develop[]
its processes, manuals, advertising materials, etc. and on building goodwill and obtaining a
national reputation as a provider of automotive services" supports the "enforcement of the
covenant not to compete [and] is necessary to protect the legitimate business interests" of a
franchisor. Bica, 2011 WL 4829420, *4. Similarly, the "training, assistance, and a protected
territory" a franchisor provides to enable a franchisee to "build a successful automotive business"
are business interests sufficient to support enforcement of a non-compete covenant. Id.; Meineke
Car Care Centers, Inc. v. Catton, 2010 WL 2572875, *4 (W.D.N.C. June 24, 2010) (enjoining a
former franchisee based upon identical interests).

Courts also recognize the franchise itself is a legitimate business interest sufficient to
warrant the enforcement of a non-competition covenant because, among other reasons, the
franchise typically includes a detailed business operating format and system of doing business not
readily available through independent means. See Outdoor Lighting Perspectives Franchising, Inc.
v. OLP-Pittsburgh, Inc., 2012 WL 1313251, at *3 (W.D.N.C. Apr. 17, 2012). In OLP-Pittsburgh,
Inc., this Court found the franchisor "also has a legitimate interest in preserving the integrity of its
franchise system. If its noncompete provisions are not enforced, then the entire [] franchise system
is placed in jeopardy as franchisees may ignore their agreements and begin operating as a
competing business knowing that the noncompete provisions may be disregarded and will provide
no protection to other franchisees." Id.; see Meineke Car Care Centers, LLC v. ASAR Inc., 2014
WL 3952491, *4 (W.D.N.C. August 13, 2014) (holding that franchisor suffers damage to its
goodwill and reputation when a franchisee offers the same services from the same location using
franchisor's marks and telephone numbers); see also Meineke Car Care Centers, Inc. v. Glover,
2011 WL 240462, *3 (W.D.N.C. January 21, 2011) (recognizing as a protected, legitimate

business interest a franchisor's knowledge, manner, and training imparted to a franchisee who in turn uses that knowledge, manner, and training to gain customers by offering similar services at lower prices because the former franchisee is no longer paying franchise fees); see also Pinehurst Surgical Clinic, P.A. v. DiMichele-Manes, 741 S.E.2d 927, 2013 WL 1901710, *2 (N.C. App. 2013) (reversing trial court's denial of injunctive relief and recognizing an entity's competitive interests as a legitimate business interest).

Here, the undisputed facts demonstrate Maaco's proprietary operating system, confidential information, and the goodwill associated with its trademarks, service marks, trade name, and trade dress developed through the investment of substantial amount of time, money and effort, are legitimate business interests worthy of the protections of a restrictive covenant, as are Maaco's substantial investment of resources to develop its operating format, processes, manuals, advertising materials, goodwill, and national reputation as a provider of automotive services and maintain the integrity of its franchise and franchise system. This conclusion is also supported by Defendants' acknowledgement and agreement in the Franchise Agreement of the substantial value they received from Maaco's efforts.

Maaco satisfies the second prong of the test because the restrictive covenant at issue is reasonable with respect to both time and territory. The non-competition covenant is reasonable as to time because, among other reasons, the term is only for one (1) year which is a reasonable period to permit a franchisor the opportunity to retain the goodwill in the market area without any erosion arising from the former franchisee's provision of goods and services that do not meet the franchisor's standards. See Meineke Car Care Centers, Inc. v. RLB Holdings, LLC, 423 F.App'x. 274, 286 (4th Cir. 2011) (noting that a period of three years to re-franchise a market for purposes of a lost profits calculation was not unreasonable or speculative). North Carolina's courts regularly

uphold covenants for periods in excess of one (1) year in franchise agreements under nearly identical fact patterns. See Bica, 2011 WL 4829420, at *5; Catton, 2010 WL 2572875, at *5; Meineke Car Care Ctrs., Inc. v. Quinones, 2006 WL 1549708, *4 (W.D.N.C. June 1, 2006). Likewise, North Carolina courts uphold non-compete covenants in excess of one year in other contexts as well. See Triangle Leasing Co., Inc. v. McMahon, 393 S.E.2d 854, 858 (N.C. 1990) (two-year period upheld); Whittaker Gen. Med. Corp. v. Daniel, 379 S.E.2d 824, 826 (N.C. 1989) (two-year period upheld).

The covenant is reasonable as to territorial restriction because, among other reasons, the territorial restriction is limited to ten (10) miles from the Center and any other Maaco centers. Such a radius is reasonable because it protects a franchisor, such as Maaco, from a former franchisee diluting its goodwill and reputation in the relevant trade area. See OLP-Pittsburgh, Inc., 2012 WL 1313251, at *3. It also permits Maaco the opportunity to protect authorized franchisees and/or secure other franchisees in that trade area. See Bica, 2011 WL 4829420 at *5 (noting that allowing a former franchise to continue operations would unfairly burden other franchisees in the area). Moreover, this Court has enforced similar territorial restrictions contained in covenants not to compete with nearly identical fact patterns as those at issue here. See Lockhart v. Home-Grown Indus. of Ga., Inc., 2007 WL 2688551 at *5 (W.D.N.C. September 10, 2007); Catton, 2010 WL 2572875, at *4; Bica, 2011 WL 4829420, at *5; Quinones, 2006 WL 1549708, *4. Moreover, nothing contained in the Franchise Agreement restricts Defendants' ability to own or operate a vehicle painting and body repair business outside of the restricted area within the restricted period of one (1) year provided that the business is located outside of the ten (10) mile restricted area. As a result, Defendants are not unreasonably restricted from continuing in the business should they choose.

Defendants' agreement to the time and scope of the non-competition provision also strongly supports the reasonableness of those time and scope provisions. "[A] further consideration by this Court, in recognizing the validity of these covenants, is that at the time of entering these contracts containing covenants not to compete both parties apparently regarded the restrictions as reasonable and desirable." United Labs., Inc. v. Kuykendall, 370 S.E.2d 375, 380 (N.C. 1988) (internal citations omitted). As the North Carolina Supreme Court stated, "'by enforcing the restrictions [a] court is only requiring the defendants to do what they agreed to do.'" Id. (internal citations omitted).

Maaco also satisfies the third prong of the test because the issuance of the requested preliminary injunction does not interfere with the interest of the public. Enforcement of this covenant will not violate public policy; rather, it will support North Carolina public policy. "[I]t is as much a matter of public concern to see that valid [covenants] are observed as it is to frustrate oppressive ones." United Labs., 370 S.E.2d at 380 (quoting Sonontone v. Baldwin, 42 S.E.2d 352, 355 (N.C. 1947)). This public policy applies in considering the enforceability of a restrictive covenant in both the employment and sale of business context. Id. (holding that the "[s]ame principle underlying this Court's sustaining the enforceability of restrictive covenants that preclude a seller of a business from competing with the new owner was subsequently extended to the employer-employee situation.").

As such, Maaco is entitled to the issuance of a preliminary injunction based upon its claim in Count I of its Verified Complaint.

Count II – Trademark Infringement

Maaco also seeks the issuance of a preliminary injunction based upon its claims in Count II for trademark infringement. In order to prevail on its claim for trademark infringement, Maaco must demonstrate that: (1) it owns a valid and protectable trademark; (2) Defendants used the trademark "in commerce" without authorization; (3) Defendants used the trademark "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (4) Defendants use of the trademark is likely to confuse consumers. 15 U.S.C. §1114(1); See <u>Rosetta Stone, Ltd. v. Google, Inc.</u>, 676 F.3d 144, 152 (4th Cir. 2012) (setting forth elements of claim for trademark infringement).

The undisputed facts establish the first three elements of the claim because: (1) Maaco owns the Maaco Marks, each of which is properly registered; (2) Defendants continue to display and/or use the Maaco Marks by, among other things: (i) displaying Maaco's federally registered "Maaco" trademark on its Facebook and Google profile pages, as well as forms and invoices; and (ii) partially and incompletely displaying Maaco's federally registered "America's Bodyshop" trademark on its building as the word "Bodyshop" remains even though the word "America's" was removed; and (3) using and/or displaying the Maaco Marks "in commerce" at its competing business. The undisputed facts also establish that Defendants' use of Maaco's trademark is likely to confuse consumers based on an analysis of the applicable factors. They are: (1) the strength and distinctiveness of Maaco's trademark as used in the marketplace; (2) the similarity of the two trademarks at issue from the consumer's perspective; (3) the similarity of the goods and services that the trademarks identify; (4) the similarity of the facilities used; (5) the similarity of advertising used; (6) defendant's intent; (7) actual confusion; (8) quality of defendant's product; and (9) the sophistication of the consuming public. See <u>Rosetta Stone</u>, 676 F.3d at 153 (citing to <u>George &</u>

Co., 575 F.3d at 393). Of the nine (9) factors two, the eighth (8th) and ninth (9th), do not apply to this analysis because, as the Fourth Circuit Court of Appeals noted, the quality of a defendant's product typically only applies in "situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods" and the sophistication of the consuming public is only considered when the relevant market is not the public at large. George & Co., 575 F.3d at 399–400.

Each of the seven (7) remaining factors weighs heavily in Maaco's favor and four are beyond dispute. The second factor weighs heavily in Maaco's favor because the marks at issue— "Maaco" and "Jeffco"— are stylized in the same font, size, pattern, and color and "America's Bodyshop" and the partially modified "America's Bodyshop"—are the same from any perspective. Factors three, four, and five relate to the goods and services, facilities, and advertising at issue. The goods, services, and facilities under consideration are not only similar; they are identical because Defendants continue to offer the identical goods and services from the identical facility through the identical advertising media, which satisfies the critical question of whether the goods and services are sold in the same "channels of trade." See Rosetta Stone, 676 F.3d at 155 (noting the key question is whether both products are sold in the same channels of trade); George & Co., 575 F.3d at 397 (finding that goods and services need not be identical but affirming trial court's finding that the factor weighed in plaintiff's favor because the parties' goods and services were nearly identical, as did the factor considering advertising because the parties "competed in a similar manner in overlapping markets").

The remaining three factors—one, six, and seven—also weigh in Maaco's favor. The first factor considers whether Maaco's Marks are strong and distinctive. First, Maaco's trademarks— "Maaco" and "America's Bodyshop"—are strong and distinctive. The "Maaco" trademark is

strong and distinctive because it is considered fanciful and inherently distinctive, as it is a made-up word created for the sole purpose of serving as a trademark. See George & Co. 575 F.3d at 383. Though not fanciful, "America's Bodyshop" is likewise strong and distinctive because it has acquired a secondary meaning, even if considered a "descriptive" mark. A mark is presumed to enjoy a secondary meaning when it is registered on the United States Patent and Trademark Office's Principal Register. Such registration is considered *prima facie* evidence that the mark has, among other things, obtained secondary meaning. Retail Srvcs., Inc. v. Freebies Publ'g, 364 F.3d 535, 542 (4th Cir. 2004) (citations omitted). Here, Maaco's "America's Bodyshop" was first registered on November 25, 2003, renewed on December 7, 2013, published for opposition on December 8, 2015 and re-registered on the Principal Register on February 23, 2016. The sixth factor considering Defendants' intent also weighs in Maaco's favor. This factor is a "major" factor because "[i]f there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion." George & Co., 575 F.3d at 397 (citing Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1535 (4th Cir. 1984)). There is little doubt Defendants intend to deliberately cause confusion, because: (1) Defendants' made their signs and advertisements substantially similar, if not identical, to Maaco's so that the signs and advertisements so closely resembled Maaco's that consumers could not distinguish them; and (2) Defendants continue to identify themselves as a Maaco through their Facebook and Google profile pages, their forms and documents, and by telephone. See Declaration of Edmund Wright ("Wright Decl.") at ¶ 6, which (advising Mr. Wright that they are "still Maaco").

The seventh and final factor for consideration considers the likelihood of confusion. "The test is *likelihood* of confusion; evidence of actual confusion is unnecessary." <u>Sara Lee Corp. v. Kayser-Roth Corp.</u>, 81 F.3d 455, 463 (4th Cir. 1996) (citing <u>Pizzeria Uno</u>, 747 F.2d at 1527.[1] "Although proof of actual consumer confusion is never a prerequisite to a finding that there is a likelihood of confusion, actual consumer confusion should be inferred when a former franchisee continues to use any mark previously licensed to the former franchisee by its former franchisor." <u>Hospitality Int'l, Inc. v. Mahtani</u>, 1998 WL 35296447 at *6 (M.D.N.C. August 3, 1998). This Court agrees. "[C]ontinued trademark use by one whose trademark has been cancelled satisfies the likelihood of confusion test and constitutes trademark infringement." <u>Bica</u>, 2011 WL 482920, at *3 (citing <u>Burger King Corp. v. Mason</u>, 710 F.2d 1480, 1491 (11th Cir. 1983)) (finding likelihood of consumer confusion where former franchisee continued using same trademarks and phone number as previous franchised business); <u>see also</u> <u>Catton</u>, 2010 WL 2572875 at *2 (finding a likelihood of customer confusion where a former franchisee was using the franchisor's trademarked name on checks); <u>Quinones</u>, 2006 WL 1549708, at *2 (finding a likelihood of consumer confusion where a former franchisee continued operating a competing business at the same location as the franchised business using materials featuring the franchisor's name, logo, and trade dress). Defendants continue to use and display certain of the Maaco Marks, as well as Maaco's trade dress, service marks, and distinctive color scheme on the exterior and interior of the Center, as well as on forms and invoices. <u>See</u> Declaration of Mike Odum ("Odum Decl.") at ¶ 4 (stating the Center continues to use Maaco's trademarked name on its invoices); <u>Catton</u>, 2010 WL

---

[1] Unlike false advertising claims arising under 15 U.S.C. §1125(a), trademark infringement cases do not require evidence of "deception." <u>Cf.</u> <u>Scotts Co. v. United Indus. Corp.</u>, 315 F.3d 264, 272 (4th Cir. 2002) (setting forth elements for false advertising claims) and <u>Rosetta Stone</u>, 676 F.3d at 152 (setting forth elements of claim for trademark infringement).

2572875 at *2 (finding a likelihood of customer confusion where a former franchisee was using Meineke's trademarked name on checks). Defendants also continue operating an identical business at the exact same location as the former Maaco Center under the displayed name of "Jeffco," and previously confirming to the public verbally via telephone that the Center is still a Maaco with a different name after Maaco's termination of Defendants' license to use the Maaco Marks, trade dress, service marks, and distinctive color scheme. See Odum Decl. at ¶¶ 4–7; Wright Decl. at ¶¶ 5–6; see also McNeil-PPC, Inc. v. Granutec, Inc., 919 F. Supp. 198 (E.D.N.C. 1995) (use of similar color scheme and appearance of acetaminophen gel caps was confusingly similar).

The weight of the totality of the law and facts tips the analysis of each of the factors in determining a "likelihood of confusion" deeply in Maaco's favor. In combination with the analysis for the remaining elements, Maaco demonstrates a substantial likelihood of success on the merits of its claim for trademark infringement. As the Fourth Circuit noted, "[w]e may grant injunctive relief to the owner of a registered trademark whose rights to the mark have been infringed on by another's use of a copy or colorable imitation that is 'likely to cause confusion, or to cause mistake, or to deceive.'" Sara Lee Corp., 81 F.3d at 463 (citations omitted). Here, Defendants' conduct is both intended to and will cause confusion or mistake, and enjoining their continued operation of the Center is appropriate and necessary.

Count III – Trade Dress Infringement

Maaco also seeks the issuance of a preliminary injunction based upon its claims in Count III for trade dress infringement. In order to prevail on its claim for trade dress infringement, Maaco must demonstrate that: (1) its trade dress is primarily non-functional; (2) the alleged infringement creates a likelihood of confusion; and (3) the trade dress either (a) is inherently distinctive or (b)

has acquired a secondary meaning. See Djarum v. Dhanraj Imports, Inc., 876 F. Supp. 2d 664, 668 (W.D.N.C. 2012) (setting forth elements of claim for trade dress infringement).

Maaco established the first element as its trade dress is entirely non-functional because it is comprised of an arbitrary combination of colors and graphic elements that are neither essential to use of the goods or services provided by Maaco or related to the cost or quality of those goods or services. See Djarum v. Dhanraj Imports, Inc., 876 F. Supp. 2d at 668 (W.D.N.C. 2012) (stating that such arbitrary combination established the non-functional nature of the trade dress). Additionally, Defendants may use any infinite combination of fonts, colors, materials and designs to create a logo and signage for their business, but have instead chosen to copy that of Maaco's. See Tools USA & Equip. Co. v. Champ Frame Straightening Equip. Inc., 87 F.3d at 659 (4th Cir. 1996) (stating that one test for functionality is the availability to competitors of alternative options).

The second element to consider is whether Maaco can establish that Defendants' use of the copied trade dress is likely to confuse consumers. In determining whether likely confusion exists, the Court considers how the two parties use the trade dress at issue to determine whether Defendants' use is *likely* to cause confusion. See Djarum v. Dhanraj Imports, Inc., 876 F. Supp. 2d at 668–69 (W.D.N.C. 2012) (holding that Defendant's unauthorized use of the Plaintiff's trade dress in commerce in connection with the sales and marketing of similar products in the same territory as Plaintiff caused a likelihood of confusion). Here, Defendants are using the copied, infringing trade dress at the exact same location as Maaco's previously authorized location and are providing the same services and products as were provided by the formerly licensed Center. As such, Defendants' unauthorized use of Maaco's trade dress in providing the same services as Maaco and in Maaco's formerly authorized location shows direct likelihood of confusion by

consumers as related to the infringing trade dress. Considering whether Defendants' use is *likely* to cause confusion, we consider nine factors. See Rosetta Stone, 676 F.3d at 153. As set forth above, a consideration of those nine factors weighs in Maaco's favor. As such, Maaco satisfies the second element.

The third element for consideration is whether Maaco's trade dress is either inherently distinctive or has acquired secondary meaning. Maaco fulfills the requirement to show its trade dress has acquired a secondary meaning due to Defendants' intentional and direct copying of Maaco's trade dress. "[E]vidence of intentional, direct copying establishes a *prima facie* case of secondary meaning sufficient to shift the burden of persuasion to the defendant on that issue…" M. Kramer Mfg. Co. v. Andrews, 783 F.2d 421, 448 (4th Cir. 1986).

Defendants' trade dress displayed at Defendants' "Jeffco" auto body repair shop is an intentional and direct copy of Maaco's trade dress that is likely to confuse consumers and satisfy the final element. Specifically, both the Maaco and "Jeffco" trade dress, affixed on the front and side of the building, on signs entering the parking area, and within the Center itself, include the following: (1) thick white font used for the name "Jeffco" and "Maaco"; (2) bordered font shading of dark blue to a medium-tone blue around the white "Maaco" and "Jeffco" names; (3) a red, curved and tapering underline under the "Maaco" and "Jeffco" names; and (4) the word "Bodyshop" directly under the "Maaco" and "Jeffco" names in the exact same font, size and color. Only slight differences in color tone and font exist between the trade dress of Maaco and "Jeffco." Utilizing a combination of similar features in a "particular configuration of design features" establishes Defendants' efforts to intentionally copy Maaco's trade dress sufficient to establish secondary meaning.

Maaco is substantially likely to succeed on the merits of its trade dress claim and the issuance of a preliminary injunction is appropriate.

*Irreparable Harm*

Defendants' continued unauthorized use of the Maaco Marks beyond the date of termination of the Franchise Agreement and operation of an identical business under similar or identical marks at the exact same location in violation of the covenant not to compete and the Lanham Act threatens Maaco, its authorized franchisees, and the consuming public generally with immediate and irreparable harm. Irreparable harm exists; Defendants' violation of the contractually agreed upon covenants not to compete adversely affect the value of legitimate, law abiding Maaco franchisees, thus harming the Maaco system as a whole. Moreover, Defendants' operation of a competing business within the covenanted geographical area using the knowledge, training and confidential and proprietary information gained from Maaco permit Defendants to unfairly achieve a significant competitive advantage over all of the other legitimate centers in their area by virtue of, among other things, not having to pay for the privilege of using Maaco's confidential and proprietary know-how. Outdoor Lighting, 2012 WL 1313251, at *3; see also Catton, 2010 WL 2572875 at *4; Bica, 2011 WL 4829420 at *5; Quinones, 2006 WL 1549708 at *3. Irreparable harm also exists because it is substantially likely that consumers are being deceived by Defendants' conduct of operating a competing business from the same location it operated an authorized Maaco while using a substantially similar trade name and trade dress while telling prospective customers that they are "still Maaco." See Philips Elecs. N. Am. Corp. v. Hope, 631 F. Supp. 2d 705, 711 (M.D.N.C. 2009) ("Loss of permanent relationships with customers and loss of proprietary information may constitute irreparable harm."); Catton, 2010 WL 2572875 at *2; Bica, 2011 WL 4829420 at *3; see also Duct-O-Wire Co. v. U.S. Crane, Inc., 31 F.3d 506, 509–

10 (7th Cir. 1994) (in affirming the district court's granting of the plaintiff's motion for a preliminary injunction, the Seventh Circuit Court of Appeals stated: the "irreparable harm is that [Franchisor] will lose sales and the opportunity to maintain and develop relationships with existing and potential customers").

*The Balance of Equities*

Initially, any alleged potential harm to Defendants is the result of Defendants' own conduct. In such instances, this Court has uniformly held in franchisor-franchisee cases that such self-inflicted harm is far outweighed by the damage done by the infringement of a franchisor's trademark. See Catton, 2010 WL 2572875 at *3 (internal citations omitted); Bica, 2011 WL 4829420 at *4; Quinones, 2006 WL 1549708 at *3 (finding that the harm to Meineke outweighs any harm to the defendants because any harm suffered by the defendants would be self inflicted). Defendants' alleged harm is limited. Importantly, Maaco's covenant against competition only prohibits Defendants from selling a limited and specific set of products and services within the covenanted area and term. Defendants may, then, pursue their chosen business and/or occupation in a substantial geographic area after the expiration of the relevant term. Defendants specifically acknowledged and agreed that such a covenant was reasonable when they signed the Franchise Agreement. See Catton, 2010 WL 2572875 at *4; Bica, 2011 WL 4829420 at *6; Quinones, 2006 WL 1549708 at *3 (W.D.N.C. June 1, 2006).

As set forth above, Maaco suffers irreparable harm. Such harm outweighs any potential harm to Defendants. Maaco satisfies the third element for injunctive relief.

*The Public Interest*

The final element is whether a preliminary injunction will serve the public interest.

Here, the issuance of a preliminary injunction will serve the public interest. First, because it will encourage franchisors, like Maaco, to continue to invest substantial assets in providing franchisees with professional training, skills and the promotional advantages of a recognized trade name, which enable them to establish their own businesses at a reduced cost. Also, it will protect the investments franchisors make in developing those systems and prohibit a third-party from taking advantage of the skills and goodwill they were provided without paying what they agreed in exchange. See S & R Corp., 968 F.2d at 379. Moreover, "[w]here a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest." S & R Corp., 968 F.2d at 379 (quoting Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 197–198 (3d Cir. 1990)). And, there is a strong public interest in preventing trademark infringement. See Rebel Debutante LLC v. Forsythe Cosmetic Grp., Ltd., 799 F. Supp. 2d 558, 581 (M.D.N.C. 2011). Finally, there is a strong public interest in honoring the sanctity of a contractual relationship. See Gen. Motors, LLC v. Bill Kelley, Inc., 2012 WL 5378249, at *9 (N.D.W. Va. Oct. 31, 2012), aff'd, 528 F. App'x 312 (4th Cir. 2013) (In finding the public interest was served by enforcement of a settlement agreement, the District Court said that, "It would be unjust to allow [the defendant] to essentially void or rescind the Agreement after enjoying the benefits of operating under it for more than two years."); see also NaturaLawn of Am., Inc. v. W. Grp., LLC, 484 F. Supp. 2d 392, 404 (D. Md. 2007) (It is in the public interest to … enforce valid contracts. It is also in the public's interest to validate the interests of mark owners and the proprietary nature of trade secrets.").

IT IS THEREFORE, ORDERED AND ADJUDGED, that

1.      The Motion for Preliminary Injunction, (Doc. No. 18), is hereby GRANTED;

2.      Defendants, and all persons acting on their behalf, in concert with them, or under their control, are hereby enjoined from:

(a)     manufacturing, packaging, distributing, selling, advertising, displaying, or promoting any product or service bearing any of the Maaco Marks or any colorable imitation thereof;

(b)     displaying or using any of the Maaco Marks to advertise or promote the sale of, or to identify, the Center, or any product or service provided therein; and

(c)     making in any manner whatsoever any statement or representation, or performing any act, likely to lead members of the public to believe that Defendants, the Center, and the products and services provided therein, are in any manner, directly or indirectly, associated, affiliated, or connected with, or licensed, sponsored, authorized, or approved by Maaco;

3.      Defendants, and all persons acting on their behalf, in concert with them, or under their control, are hereby ordered to:

(a)     recall and deliver up to Maaco all names, marks, signs, logos, forms, advertising, manuals, computer software, supplies, products, merchandise, color scheme, and promotional materials which bear, or make reference to, any of the Maaco Marks, or any colorable imitation of the Maaco Marks, or which contain a name, logo, mark or trade dress confusingly similar to the Maaco name, logo, marks or trade dress;

(b)     recall and deliver up to Maaco all copies and editions of any Maaco operations manuals that are in their actual or constructive, direct or indirect, possession,

custody, or control, including all supplements and addenda thereto, and all other materials containing center operating instructions, business practices, or plans of Maaco;

(c)     allow Maaco, at a reasonable time, to enter the premises of the Center and make whatever changes, including removal of tangible assets, that are necessary to distinguish the premises from the appearance as Maaco® centers;

(d)     cease and desist from using confusingly similar trade names, including the name "Jeffco," in connection with any business providing, in whole or in part, motor vehicle painting or body repair services or products;

(e)     cease and desist from using confusingly similar trade dress, including any trade dress that contains (1) thick white font used for the name; (2) bordered font shading of dark blue to a medium-tone blue around the font used for the name; (3) a red, curved and tapering underline under the font used for the name; and (4) the word "Bodyshop" directly under the business' name; and

(f)     cease and desist from identifying their business as currently or formerly authorized and/or affiliated with Maaco, including by informing the public and existing or potential customers that their business is "the same as" or "used to be" Maaco;

4.     Defendants, directly or indirectly, and all persons acting on their behalf, in concert with them, or under their control, are hereby enjoined and prohibited, for a period of one (1) year from the effective date of this order and injunction, from:

(a)     owning, maintaining, engaging in, being employed by, financing, assisting or having any interest in any business providing, in whole or in part, motor vehicle painting or body repair services or products at the premises of 2758 McCarty Road, Saginaw,

Michigan 48603 or within a ten (10) mile radius of 2758 McCarty Road, Saginaw, Michigan 48603; and

      (b)     owning, maintaining, engaging in, being employed by, financing, assisting or having any interest in any business providing, in whole or in part, motor vehicle painting or body repair services or products at or within a ten (10) mile radius of any existing Maaco location that was in existence as of the date of this Order.

5.     Defendants shall file with the Court and serve upon Maaco's counsel within ten (10) days after entry of this injunction a written notice, under oath, setting forth in detail the manner in which the Defendants have complied with this injunction;

6.     Maaco is not required to post a bond; and

7.     Maaco shall serve upon Defendants the Preliminary Injunction at Defendants' last known address(es) within three (3) business days of the date of this Order.

      THIS ORDER shall remain in effect until further Order of this Court.


                   Signed: September 12, 2016

                   Graham C. Mullen
                   United States District Judge